IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD ALLEN, BARBARA CRABTREE, LYNN CRABTREE, VENUS HOAGLAN, DANIEL JACKSON, GWEN JACKSON-LOSS, JESSICA JACKSON, MARTHA KNIGHT, LUCILLE SILVA, MICHAEL TOOLEY, and CLARENCE WRIGHT,<br><br>  Plaintiffs,<br><br>  v.<br><br>UNITED STATES OF AMERICA, and KENNETH SALAZAR, as Secretary of the United States Department of the Interior,<br><br>  Defendants.<br>_____/ | No. C 11-05069 WHA<br><br>**ORDER ON MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT** |

### INTRODUCTION

In this Indian tribal rights action, defendants move to dismiss plaintiffs' complaint for lack of subject-matter jurisdiction and failure to state a claim. Plaintiffs move for summary judgment. This order follows full briefing and oral argument. For the reasons stated below, defendants' motion to dismiss is **GRANTED**. Plaintiffs' motion for summary judgment is **DENIED AS MOOT**.

### STATEMENT

This litigation arises out of a request by 43 individuals, each allegedly possessing a one-half or more degree of Pomo Indian blood, to the Bureau of Indian Affairs (BIA), to call a

Secretarial election to approve efforts by these Indian petitioners to reorganize under the Indian Reorganization Act as the Ukiah Valley Pomo Indian Tribe.[1] Plaintiffs are eleven of these 43 petitioners. These eleven claim that they qualify for reorganization under the IRA because they are all individuals possessing one-half or more Indian blood and are residing on the Pinoleville Reservation (Compl. ¶ 26). It is unclear why the other 32 declined to join in this action.

*     *     *

In the 1950s, the United States took steps to terminate the existence of a number of Indian tribes and abolish federal programs available to them as a result of their special status as "recognized" tribes. Under the California Rancheria Act of 1958, the United States purported to terminate the existence of 41 California Indian tribes, distributing tribal property to individual tribe members. Upon distribution of tribal property, the tribes ceased to exist (for purposes of federal law) and the members of the former tribes were stripped of their status as Indians. Tribal lands, which had been held in trust and exempted from state taxation and regulatory laws, were transformed into parcels held in fee simple by the distributees. Included among the 41 California Indian tribes terminated in the Rancheria Act was the Pinoleville Rancheria, Pomo Indians of California (AR 164).[2]

In 1979, individuals from most of the terminated tribes commenced litigation in the United States District Court for the Northern District of California. The plaintiffs sought restoration of their status as Indians and entitlement to federal Indian benefits, as well as the right to reestablish their tribes as formal government entities. The litigation was certified as a class action (AR 4).

In 1983, the litigation was settled with respect to the members of seventeen former tribes, including the Pinoleville Rancheria (AR 1–14). A stipulated judgment was entered into by the parties, which among other things, restored and confirmed the tribal status and federal tribal

---

[1] This order uses the term "Indian" to refer to Native Americans, for brevity and because the use of this term in the relevant federal legislation remains as yet unsupplanted by more accurate phrasing.

[2] Citations to the Administrative Record are shortened to refer to the final sequence of numbers in the Bates ranges stamped on the documents.

2

recognition of these seventeen tribes (*ibid.*). Following the 1983 stipulated judgment and the Pinoleville Rancheria's reestablishment as a federally recognized tribe, there was internal division over who was properly a member of the tribe (AR 41). In 2005, the Pinoleville Rancheria ratified a new constitution, renaming itself the Pinoleville Pomo Nation (AR 45). The 2005 constitution set forth different membership criteria for Indians to be part of the Pinoleville Pomo Nation, and as a result, a number of Indians were disenrolled from the tribe (*ibid.*).

Between March 1, 2008, and June 30, 2008, various individuals who had been disenrolled from the Pinoleville Pomo Nation circulated a petition on the Pinoleville Indian Reservation requesting that the Secretary of the Interior call and conduct an IRA election for the Ukiah Valley Pomo Indian Tribe (AR 54–77, 82–83). It is undisputed that the Ukiah Valley Pomo Indian Tribe is not a federally recognized tribe. The petition requested that the Secretary allow the members of the alleged tribe to vote on a proposed constitution to organize a tribal government (*ibid.*). The petition was signed by 43 individuals.

On May 28, 2009, some of the individuals seeking to organize as the Ukiah Valley Pomo Indian Tribe met with the then-Regional Director of the Pacific Regional Office of the Bureau of Indian Affairs, Dale Morris (AR 84). At that meeting, Regional Director Morris was presented with the petition as well as a proposed tribal membership list, a copy of the Ukiah Valley Pomo Indian Tribe's proposed constitution, and a letter from Lester Marston, petitioners' counsel, dated May 27, 2009, which formally requested that the Secretary call and conduct an election pursuant to the IRA (AR 84–130).

On November 4, 2009, Regional Director Morris sent a letter to Jerry Gidner, Director of the BIA, requesting guidance on how to proceed with the Ukiah Valley Pomo Indian Tribe's request for an IRA election (AR 131–32). Regional Director Morris stated that he was "not clear" what authority he had to conduct an election for the Ukiah Valley Pomo Indian Tribe because he understood that he had only been "delegated the authority to authorize a Secretarial election for those tribes that are federally recognized" (*ibid.*).

3

1    In the early months of 2010, Attorney Marston communicated with various officials
2 within the BIA, seeking guidance as to the status of petitioners' request (AR 135–39, 146,
3 153–55). In his email dated March 30, 2010, Attorney Marston mentioned that his clients were
4 asking him to file suit against the BIA "for agency action unreasonably delayed" (AR 159).

5    On May 17, 2010, the new Acting Regional Director of the Pacific Regional Office of
6 the BIA, Dale Risling, sent a letter to plaintiffs' counsel, requesting that the proposed members
7 of the Ukiah Valley Pomo Indian Tribe submit further information to assist him in making a
8 determination on petitioners' request for a Secretarial election (AR 163–73). Specifically,
9 Regional Director Risling listed six inquiries concerning tribal membership, including the lineal
10 descendant, dependence, distributee, and blood status of petitioners, noting that in his office's
11 review of the submitted materials, the BIA had determined that fourteen of the 43 listed
12 individuals were distributees, dependent members, or lineal descendants of a distributee or
13 dependent member of the Pinoleville Pomo Nation and that twenty out of the 43 were "one-half
14 Pomo/Indian bloods" (*ibid.*). As to the other 23 individuals, Regional Director Risling requested
15 that they submit additional documentation so that his office could determine their blood quantum
16 (*ibid.*).

17    On July 13, 2010, Attorney Marston replied to Regional Director Risling's letter, stating
18 that the letter was not responsive to petitioners' request, and demanding that Regional Director
19 Risling call and conduct an election for petitioners to organize their tribal government
20 (AR 176–82). Attorney Marston further stated that if an election was not authorized on or
21 before July 30, 2010, petitioners would file suit against the Secretary of the Interior seeking
22 an order directing the Secretary to call and conduct an election (*ibid.*).

23    Less than a month later, Regional Director Risling denied petitioners' request for the
24 Secretary to call and conduct an election on the grounds that the Ukiah Valley Pomo Indian
25 Tribe was not a federally recognized tribe (AR 183–84). Regional Director Risling's decision
26 stated that "the authority for acknowledging that a tribe may organize under the IRA resides
27 within the Assistant Secretary-Indian Affairs," and that the Assistant Secretary-Indian Affairs
28 "or his authorized representative must first acknowledge the Tribe as eligible to organize under

4

1  the IRA and then authorize a Secretarial election allowing the members of the Tribe an
2  opportunity to ratify their proposed Constitution" (*ibid.*). Regional Director Risling therefore
3  concluded that he was "without the authority" to call or conduct a Secretarial election (*ibid.*).
4  The decision denying petitioners' request included a paragraph explaining petitioners' right to
5  appeal the decision to the Interior Board of Indian Appeals (IBIA) (*ibid.*).

6  Instead of filing an appeal with the IBIA, petitioners, by letter dated September 8, 2010,
7  requested that Regional Director Risling reconsider his decision (AR 185–90). Petitioners also
8  sent a copy of their request for reconsideration via email to George Skibine, Principal Deputy
9  Assistant Secretary-Indian Affairs (AR 210). In that email, petitioners requested that Assistant
10 Secretary Skibine advise Regional Director Risling to call the requested Secretarial election
11 (*ibid.*). On October 7, 2010, Assistant Secretary Skibine informed petitioners that Regional
12 Director Risling would reconsider the decision and issue a new decision within 45 days
13 (AR 217).

14 Just over two weeks later, Regional Director Risling issued a reconsidered response,
15 again denying petitioners' request for a Secretarial election, advising petitioners that the position
16 of the BIA "remains the same" and that "[u]ntil the Assistant Secretary-Indian Affairs has
17 determined that the Ukiah Valley Pomo Indians are entitled to organize under [the IRA] as a half
18 blood community," the BIA was "without the authority to call and conduct a Secretarial
19 election" (AR 219–20). Regional Director Risling again provided petitioners with notice of their
20 right to appeal to the IBIA within thirty days. Petitioners did not file a notice of appeal. It
21 appears that Attorney Marston called various officials within the BIA over the course of the next
22 several weeks, and was told that the Assistant Secretary planned to reconsider Regional Director
23 Risling's decision (Marston Decl. ¶¶ 23–26). None of these communications are documented.

24                            *          *          *

25 This action was filed on October 14, 2011, challenging the BIA's failure to call a
26 Secretarial election for the Ukiah Valley Pomo Indian Tribe under the IRA. The complaint
27 alleges that defendants violated the Fifth Amendment, the IRA and the Administrative Procedure
28 Act, and seeks declaratory and injunctive relief. The complaint claims defendants violated the

5

Fifth Amendment and the APA by unreasonably delaying the calling and conducting of an election under the provisions of the IRA (Compl. ¶¶ 1, 32). Plaintiffs also claim that defendants acted in direct violation of the IRA by requiring petitioners to be a federally recognized tribe in order to be eligible for an election under the IRA, and by denying services and benefits to petitioners by preventing them from organizing a tribal government (*ibid.*). Plaintiffs seek a declaration that the IRA does not require that Indian tribes be federally recognized in order for tribes to be eligible for an IRA election, as well as a declaration that the Ukiah Valley Pomo Indian Tribe is in fact a "tribe" under the definition set forth in the IRA.

Plaintiffs' asserted bases for jurisdiction are: (i) 28 U.S.C. 1331; (ii) 28 U.S.C. 1361; (iii) 28 U.S.C. 1337; (iv) Article VI, cl. 2 of the Constitution; and (v) the Fifth Amendment (Compl. ¶ 2). A preliminary question is whether the government has waived its sovereign immunity. Plaintiffs assert that the government has waived sovereign immunity pursuant to the APA (Compl. ¶ 3). The government argues that there has been no final agency action, and that without such final action, its sovereign immunity remains intact.

The administrative record was lodged in March 2012 (Dkt. Nos. 24, 25). Subsequently, the government filed a motion to dismiss for lack of subject-matter jurisdiction and for failure to state a claim for relief, and plaintiffs filed a motion for summary judgment. Both motions have been fully briefed. This action presents a complex problem involving the intersection of judicial authority over the right to tribal organization under the IRA and administrative authority granted to the Department of the Interior's Bureau of Indian Affairs to determine whether a given group is entitled to organize under the IRA.

**ANALYSIS**

**1.     STANDARD OF REVIEW.**

Pursuant to FRCP 12(b)(1), dismissal is appropriate when a court lacks subject-matter jurisdiction. Jurisdiction is a threshold issue and a court is free to examine evidence beyond the allegations in the complaint, as well as weigh the extrinsic evidence. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987); *see also Safe Air v. Meyer*, 373 F.3d 1035, 1039 (9th Cir.

2004). The party invoking the jurisdiction at issue has the burden of proof. *Thornhill Pub. Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

A motion to dismiss under FRCP 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. All material allegations of the complaint are taken as true and construed in the light most favorable to the nonmoving party. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 338 (9th Cir. 1996). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957).

### 2.  SOVEREIGN IMMUNITY.

A court should dismiss a complaint where there is no subject-matter jurisdiction, including cases where the federal government is a defendant and there is no explicit waiver of sovereign immunity. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). Sovereign immunity bars both equitable and legal claims against the United States, unless waived. *Beller v. Middendorf*, 632 F.2d 788, 796 (9th Cir. 1980). This includes suits against federal officers in their official capacities to compel them to act. *Dugan v. Rank*, 372 U.S. 609, 620 (1963). The party asserting the claim against the United States has the burden of "demonstrating an unequivocal waiver of immunity." *U.S. v. Park Place Assocs., Ltd.*, 563 F.3d 907, 924 (9th Cir. 2009) (quoting *Cunningham v. U.S.*, 786 F.2d 1445, 1446 (9th Cir. 1986)). The government is correct that plaintiffs' asserted bases for jurisdiction in this action — Sections 1331, 1361 and 1337 — do not waive the sovereign immunity of the United States. *Holloman v. Watt*, 708 F.2d 1399, 1401 (9th Cir. 1983) (Section 1331 not a waiver); *Smith v. Grimm*, 534 F.2d 1346, 1352 n.9 (9th Cir. 1976) (Section 1361 not a waiver); *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985) (Section 1337 not a waiver). That leaves the APA. Thus, the threshold issue is whether the government in this case has waived its sovereign immunity under the APA. *See Rowe v. U.S.*, 633 F.2d 799, 800 (9th Cir. 1980).

### A. Waiver of Sovereign Immunity.

Although the government concedes in its brief that the APA provides a waiver of sovereign immunity in suits seeking judicial review of a federal agency action, *Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998), the government argues that plaintiffs' failure to exhaust administrative remedies precludes the district court from entertaining plaintiffs' action. *See* 5 U.S.C. 702, 704, 706. In response, plaintiffs argue that they need not have exhausted administrative remedies under the APA because Section 476(c)(1) of the IRA provides for immediate review in federal court. *Cf. Boe v. Ft. Belknap Indian Cmty. of Ft. Belknap Reservation*, 642 F.2d 276, 279 (9th Cir. 1981). Alternatively, plaintiffs argue that they need not have exhausted administrative remedies because exhaustion would be futile. Plaintiffs also argue that, because the issue presented by their complaint is one of statutory construction, exhaustion of administrative remedies is unnecessary, citing *Coyote Valley Band of Pomo Indians v. United States of America*, 639 F. Supp. 165, 169 (1986). The government responds by asserting that plaintiffs cannot invoke the rights or protections of the IRA because they are not an "eligible" (*i.e.*, "recognized") tribe.

At the outset, it must be noted that plaintiffs' first argument — that the IRA provides an immediate right to judicial review in federal court — assumes that the IRA waives the government's sovereign immunity. Indeed, plaintiffs implicitly rely on the IRA as the basis for their assertion that they need not exhaust administrative remedies, yet neither plaintiffs nor the government briefed this discrete issue, and there appears to be little authority addressing it. Courts that have faced this narrow issue, however, have held that the 1988 amendment to the IRA does in fact provide a waiver of sovereign immunity. In 1988, Congress amended the IRA to provide: "Actions to enforce the provisions of this section may be brought in the appropriate Federal district court." 25 U.S.C. 476(d)(2). "By enacting this provision, Congress consciously waived the United States' sovereign immunity and consented to suit." *Kickapoo Tribe of Oklahoma v. Lujan*, 728 F. Supp. 791, 794 (D.D.C. 1990); *see also Wopsock v. Natchees*, 279 Fed. Appx. 679, 686 (10th Cir. 2008) (unpublished) (finding that subsection (d) of the IRA contains a waiver of sovereign immunity). The legislative history for this amendment to

1  the IRA suggests that the right to seek judicial review under the IRA is narrower than plaintiffs'
2  interpretation. Specifically, the reports to the amendment clarify that the Secretary has a
3  mandatory, non-discretionary duty to call a tribally requested election within a time certain
4  after receipt of a tribal request, and that a tribe "has the right to challenge any finding made by
5  the Secretary *as to the legality of a proposed tribal document* in the appropriate Federal court."
6  *See* S. Rep. No. 100-577, at 2 (Sept. 30, 1988) (emphasis added).

7  But even assuming that the IRA waives sovereign immunity in an action such as this
8  one (*i.e.*, where the legality of a proposed tribal document is not *per se* the true pulse of the
9  parties' dispute), that does not end the matter. As the government points out, the IRA is only
10 applicable to an "Indian tribe." 25 U.S.C. 476(a). Consistent with the government's position,
11 the legislative history to the 1988 amendment refers repeatedly to the application of the IRA
12 to "eligible" tribes. *See* S. Rep. No. 100-577, at 2 (Sept. 30, 1988); *see also* H.R. Rep.
13 No. 100-453, at 2–3 (Nov. 20, 1987) (". . . the Secretary . . . has a mandatory, non-discretionary
14 duty to call elections to ratify IRA documents within a reasonable time after a request from an
15 eligible tribe."). Section 479 defines "individual Indian" as including "all other persons of
16 one-half or more Indian blood" and "tribe" as "any Indian tribe, organized band, pueblo, or
17 the Indians residing on one reservation." Plaintiffs' tribal status within the context of the IRA
18 provides the foundation of their claims, and is undeniably the focal point of this dispute.
19 Accordingly, even assuming that the IRA would provide a waiver of sovereign immunity, it must
20 first be decided whether plaintiffs constitute a "tribe" under the IRA such that they are eligible to
21 invoke the IRA in the first place as the basis for asserting that the government has in fact waived
22 its sovereign immunity. It is to this issue that this order will turn, following a brief but necessary
23 overview of the history and the statutory and regulatory scheme of the IRA.

24              *(1)     The Indian Reorganization Act.*

25 In 1832, Congress established the position of Commissioner of Indian Affairs (currently
26 within the Department of the Interior) and delegated to the Commissioner the authority to
27 manage "all matters arising out of Indian relations." Act of July 9, 1832, ch. 174, 1, 4 Stat. 564
28 (codified at 25 U.S.C. 1, 2 (1988)); *see also* Cohen's Handbook of Federal Indian Law,

1.03(4)(b) (2005 ed.). Two years later, Congress granted the President authority to "prescribe such rules and regulations as he may think fit, for carrying into effect the various provisions of [any act] relating to Indian affairs . . . ." Act of June 30, 1834, ch. 162, 17, 4 Stat. 735, 738 (codified as amended at 25 U.S.C. 9 (1988)). Simultaneously, Congress established the Department of Indian Affairs, the predecessor to the BIA. *See* Act of June 30, 1834, ch. 162, 4 Stat. 735 (codified as amended at 25 U.S.C. 1 *et seq.* (1988)). Between 1834 and 1871 Congress continued to deal directly with American Indian tribes by means of its treaty-making power, but in 1871, recognition by treaty ended with Congress' termination of its treaty-making authority. *See* Act of March 3, 1871, ch. 120, 1, 16 Stat. 544, 566 (codified at 25 U.S.C. 71 (1988)); Cohen's Handbook of Federal Indian Law, 1.03(9) (2005 ed.).

Then came the Indian Reorganization Act of 1934. Section 16 of the IRA enabled "[a]ny Indian tribe, or tribes, residing on the same reservation" to organize. Under the auspices of the IRA, the Department of the Interior and the BIA actively began to engage in tribal recognition, doing so on a case-by-case basis. *See Golden Hill Paugussett Tribe v. Weicker*, 39 F.3d 51, 57 (2d Cir. 1994); *see also* Alva C. Mather, *Old Promises: The Judiciary and the Future of Native American Federal Acknowledgment Litigation*, 151 U. Pa. L. Rev. 1827, 1831 (2003). In connection with the tribal reorganization established under the IRA, the Department of Interior, under the guidance of Felix Cohen, the first solicitor of the BIA, developed five hierarchical considerations (known as the "Cohen criteria") to determine whether a group constituted a tribe, including whether: (i) the group has had treaty relations with the United States; (ii) the group has been denominated a tribe by act of Congress or executive order; (iii) the group has been treated as having collective rights in tribal lands or funds, even though not expressly designated a tribe; (iv) the group has been treated as a tribe or band by other Indian tribes; and (v) the group has exercised political authority over its members, through a tribal council or other governmental forms. *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1272 (9th Cir. 2004); *see also* Rachael Paschal, *The Imprimatur of Recognition: American Indian Tribes and the Federal Acknowledgment Process*, 66 Wash. L. Rev. 209, 211 (1991). These considerations, however, "lacked precision in application" and led to inconsistencies in the BIA's final

10

determinations of tribal status. Paschal, *supra* at 211 (citing *Federal Acknowledgment Process: Hearing Before the Senate Select Comm. on Indian Affairs*, 100th Cong., 2d Sess. 77 (1988)). Ultimately, all of the tribes that organized under the IRA became federally recognized tribes, "and those that did not remained nonrecognized tribes." Mather, *supra* at 1831.

Following a period from 1943–1961 known as the "termination era," in which the federal government officially terminated its relationship with over one hundred tribes and granted states extensive jurisdiction over Indian territories, Congress established the American Indian Policy Review Commission in 1975 to survey the then-current status of Native Americans. "The Commission highlighted a number of inconsistencies in the Department of Interior tribal recognition process and special problems that existed with non-recognized tribes." *Kahawaiolaa*, 386 F.3d at 1272. As a result, in 1978, the Department of Interior promulgated regulations establishing a uniform procedure for "acknowledging" American Indian Tribes. *See* 25 C.F.R. 83.1–83.13 (1994). The BIA regulations criteria for acknowledgment are codified at Section 83.7. Pursuant to the acknowledgment regulations, the Department of Interior reviews an application for recognition to determine whether: (i) the group has been identified from historical times to the present, on a substantially continuous basis, as Indian; (ii) "a predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present"; (iii) the group "has maintained political influence or other authority over its members as an autonomous entity from historical times until the present"; (iv) the group has a governing document; (v) the group has lists of members demonstrating their descent from a tribe that existed historically; (vi) most of the members are not members of any other acknowledged Indian tribe; (vii) the group's status as a tribe is not precluded by congressional legislation. The Department of Interior applies its expertise to this determination and staffs historians and anthropologists to determine whether groups seeking recognition "actually constitute Indian tribes and presumably to determine which tribes have previously obtained federal recognition." *James v. U.S. Dep't of Health and Human Servs.*, 824 F.2d 1132, 1138 (D.C. Cir. 1987) (citing 25 C.F.R. 83.6(b)); *see also* 25 C.F.R. 83.11(e)(8).

Thus, through its broad delegation and acknowledgment regulations, the Department of Interior has assumed much of the responsibility for determining which tribes have met the requirements to be acknowledged as a tribe. Federal acknowledgment is "a formal political act, and it permanently establishes a government-to-government relationship between the United States and the recognized tribe as a 'domestic dependent nation,' and imposes on the government a fiduciary trust relationship to the tribe and its members." H.R. Rep. No. 103-781, 103rd Cong., 2d Sess., 2 (1994). It also renders tribes eligible for certain federal services and benefits, and therefore offers palpable advantages to tribes. *Kahawaiolaa*, 386 F.3d at 1273–74; Mather, *supra* at 1833–37. It is important to note, however, that federal statutes vary with their use and application of the term "Indian tribe." There are several federal statutes that specifically define the term "Indian tribe," and these statutes reveal that tribes "cannot be neatly divided into 'recognized' and 'nonrecognized' tribes for all purposes; rather, a tribe may be a legal entity for some federal purposes, but not for others." Cohen's Handbook of Federal Indian Law, 3.02(6)(a) (2005 ed.). With this brief history and overview of the IRA and the BIA's regulations in mind, and again, assuming that the IRA would provide a waiver of sovereign immunity, it is to the issue of whether plaintiffs constitute a "tribe" under the IRA that this order turns.

### *(2)   Recognition Proceedings Before the BIA And Application of the IRA to Non-Recognized Tribes.*

The parties agree that the Ukiah Valley Pomo Indian Tribe is not a federally recognized tribe. *See* 25 U.S.C. 479a. The government thus argues that before plaintiffs can invoke the provisions of the IRA, they must first complete acknowledgment proceedings before the BIA and become federally recognized. Plaintiffs, however, argue that despite not being federally recognized, they are nonetheless a "tribe" within the definition set forth in Section 479 of the IRA because they are "persons of one-half or more Indian blood . . . residing on one reservation." Plaintiffs' argument assumes a conclusion on the very factual issue at the heart of this litigation. Plaintiffs can only prevail on their contention that the IRA waives the government's sovereign immunity if the IRA applies to plaintiffs as a "tribe." In fact, this appears to be the exact issue that Regional Director Risling struggled with in denying

12

1    petitioners' request for the Secretary to call an election to permit the Ukiah Valley Pomo Indian
2    Tribe to organize under the IRA.
3           Perhaps the BIA and the Regional Director's struggle was due to the fact that it is
4    unclear whether BIA recognition is a prerequisite to obtaining the benefits of federal legislation,
5    particularly under the IRA, which has its own definition of "tribe." The United States Court of
6    Appeals for the Second Circuit, in determining whether a tribe was able to invoke the benefits
7    of the Nonintercourse Act (NIA), stated that the "BIA's experience and expertise in
8    implementing [the recognition] regulations . . . weigh heavily in favor of a court's giving
9    deference to the BIA" but that "[a] federal court, of course, retains final authority to rule on a
10   federal statute . . . ." *Golden Hill*, 39 F.3d 51 at 60. Like the NIA, the IRA does not state that
11   a tribe must be a "recognized" tribe to invoke the statute's benefits. It states that "[a]ny Indian
12   tribe shall have the right to organize for its common welfare, and may adopt an appropriate
13   constitution and bylaws, and any amendments thereto . . ." 25 U.S.C. 476(a). But unlike the
14   NIA, the IRA provides a definition of the term "tribe." Thus, it would seem, as the government
15   contends, that recognition as a "tribe" is a prerequisite to invoking the provisions of the IRA.
16   In fact, both parties acknowledged during oral argument that eligibility to organize under the
17   provisions of the IRA depends on whether a group is a "tribe," and, in Plaintiffs' counsel's
18   words, the group seeking to organize must make a "prima facie" showing that they are a "tribe"
19   within the meaning of the IRA. Notably, our court of appeals has held that a group of Indians
20   need not be a federally recognized tribe to fit within definition of "tribe" contained within the
21   IRA because the IRA contains a distinct definition of the term. *Pit River Home & Agric. Coop.*
22   *Ass'n v. U.S.*, 30 F.3d 1088, 1096 (9th Cir. 1994). Nevertheless, a group of Indians must still
23   meet the definition proscribed by the IRA.

So when is an Indian tribe an Indian tribe for purposes of the IRA?[3] Section 479 of the IRA, as noted above, defines "individual Indian" as including "all other persons of one-half or more Indian blood" and "tribe" as including "any Indian tribe, organized band . . . or the Indians residing on one reservation." Plaintiffs contend that they satisfy this definition. The plain language states otherwise. Section 479 does not define "tribe" as ". . . *some* Indians residing on one reservation." It defines "tribe" as ". . . *the* Indians residing on one reservation." The inclusion of the definite article "the" suggests that Congress intended the provisions of the IRA to apply only to an organized group that constituted all or close to all of "the" Indians residing on one reservation. To find otherwise would lead to an absurd result whereby any two Indians living on a reservation could create their own tribe and organize under the IRA. This cannot possibly be what Congress intended when it enacted the IRA. This is particularly so given the possible consequences of permitting hundreds, if not thousands, of two or three person "tribes" to organize under the IRA, who all reside on the same reservation and who all claim some sort of property interest in that land its resources.

The congressional debates reveal that the original language of the bill as a whole was narrowed in order to address concerns that "minority groups" could "come on a reservation asking for a particular change in a charter to take over certain property belonging to the tribe." *To Grant to Indians Living Under Federal Tutelage the Freedom to Organize for Purposes of Local Self-Government and Economic Enterprise: Hearing on S. 3645 Before the Comm. On Indian Affairs*, 73d Cong. 252–54 (1934) (statement of Sen. Burton K. Wheeler, Chairman, Comm. on Indian Affairs) ("I mean there cannot any [sic] small band or group of Indians come in on the reservation and ask for a charter to take over tribal property. It must be a majority of the Indians residing on that reservation; majority of that tribe."). The changes to the original bill narrowing its application are also demonstrated by the original language in the bill defining

---

[3] In answering this question it must be pointed out that "[t]he term 'Indian tribe' has distinct and different meanings for native people and for federal law." Cohen's Handbook of Federal Indian Law, 3.02(2) (2005 ed.). This order does not presume to understand the shared language, rituals, narratives or other relationships that may, for native individuals, comprise an understanding of what constitutes a "tribe." Nevertheless, this question must at least be answered within the context of the IRA and with the understanding that "federal law ordinarily uses the term 'Indian tribe' to designate a group of native people with whom the federal government has established some kind of political relationship . . . ." *Ibid.*

14

"Indian" to include "all other persons of one fourth or more Indian blood," as opposed to the one-half or more quantum adopted in the final draft. *Id.* at 234.

Plaintiffs, who are only eleven and not even a majority of the original petitioners who called for a Secretarial election under the IRA, are therefore not a "tribe" within the meaning of the IRA. Accordingly, plaintiffs may not utilize the IRA as the basis for the government's waiver of sovereign immunity. While plaintiffs may be correct that an aggrieved tribe can seek to enforce the provisions of the IRA in an appropriate district court without first exhausting administrative remedies, Section 479 of the IRA dictates which tribes are eligible to invoke the IRA, and plaintiffs cannot satisfy that definition.

### *(3)     Futility of Exhaustion under the APA.*

This brings us back to the APA and whether, as plaintiffs contend, exhaustion of administrative remedies would be futile. The APA allows for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. 704. "That section means that when a statute or agency rule dictates that exhaustion of administrative remedies is required, the federal courts may not assert jurisdiction to review agency action until the administrative appeals are complete." *White Mountain Apache Tribe v. Hodel*, 840 F.2d 675, 677 (9th Cir. 1988).

Plaintiffs' argument in support of their claim that they should not be required to exhaust is that the exhaustion requirement does not apply because their administrative remedies are inadequate. *See Aleknagik Natives Ltd. v. Andrus*, 648 F.2d 496, 499-500 (9th Cir. 1980) (". . . exhaustion is not required if administrative remedies are inadequate or not efficacious [or] where pursuit of administrative remedies would be a futile gesture."). Plaintiffs argue that because the Assistant Secretary agreed to reconsider Regional Director Risling's decision, the IBIA no longer has authority over this matter, citing 25 C.F.R. 2.6 (c), which provides that the IBIA does not have jurisdiction to review decisions made by the Assistant Secretary. Plaintiffs thus argue that they are without an adequate administrative remedy because the IBIA does not have jurisdiction, and the Assistant Secretary has failed to act.

This argument is not persuasive. The APA provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. 706(1). But the BIA has set up specific procedures for parties to deal with official delay. The legal abyss in which plaintiffs claim to be trapped is due to their own failure to follow the BIA's administrative appeals process. BIA regulations provide that a "person or persons whose interests are adversely affected . . . by the failure of an official to act on a request to the official, can make the official's inaction the subject of appeal." 25 C.F.R. 2.8(a). The regulation goes on to outline the process a party must follow when faced with agency inaction. 25 C.F.R. 2.8(a)(1)-(3). Instead of choosing to follow the BIA's administrative appeals process, plaintiffs instead chose to phone several higher-level officials within the BIA at various times to inquire regarding the status of petitioners' request, or to request a reconsideration of Acting Director Risling's decision. Such informal communications, many of which are not documented, do not comprise an appeal and do not, as plaintiffs contend, serve to remove jurisdiction from the IBIA. Moreover, plaintiffs very well could have avoided this dilemma had they simply appealed Regional Director Risling's decision in the first place. Indeed, Regional Director Risling twice set forth the BIA's appeal procedures in his decision denying petitioners' request for a Secretarial election, and plaintiffs cannot therefore claim that they were without the knowledge or opportunity to proceed through the requisite agency processes.

The BIA's process for appealing from a BIA decision and from agency inaction is not unreasonable. Because plaintiffs chose not to take advantage of these appeal processes, their claim that futility or agency inaction are reason to circumvent the exhaustion requirement is unconvincing. Plaintiffs cannot therefore rely on the APA as a means to waive the government's sovereign immunity. Accordingly, because plaintiffs have failed to demonstrate that the government waived its sovereign immunity under either the IRA or the APA, the government's motion to dismiss is **GRANTED.**

The Court is sympathetic to plaintiffs and to the position in which they find themselves as disenrolled members of a federally recognized tribe. This order passes no judgment on whether these eleven plaintiffs and the other 32 individuals who petitioned to organize under

16

the IRA as the Ukiah Valley Pomo Indian Tribe were or are entitled to federal recognition under the regulations promulgated by the BIA. To the extent that federal recognition is of ultimate importance to plaintiffs, they should seek federal recognition either through the BIA or through a decision of a United States court (*see* Pub. L. No. 103-454, 103(3) (1994); *David Laughing Horse Robinson v. Salazar*, Case No. 09-1977, 2012 U.S. Dist. LEXIS 5422, at *59–60 (E.D. Cal. Jan. 17, 2012)), or may, to the extent they have not already done so, petition for the federal statutory rights for which they are eligible due to their status as individual Indians, rather than as a tribe.

## CONCLUSION

Under the facts of this dispute, plaintiffs cannot satisfy the IRA's definition of "tribe" and cannot therefore invoke its provisions as the basis for waiving the government's sovereign immunity. Plaintiffs also have failed to exhaust administrative remedies because they have not appealed the BIA's decision to the IBIA, nor have they followed the BIA's regulations to appeal agency inaction. Absent such exhaustion, the Court is without jurisdiction to hear their claims. The government's motion to dismiss is therefore **GRANTED**, and plaintiffs' motion for summary judgment is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

Dated: May 15, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE